**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

STEPHEN QUISENBERRY,

    Plaintiff,

v.                                                          Case No. 8:24-cv-2608-KKM-LSG

GRAVITAS, LLC,

    Defendant.

_____

## <u>ORDER</u>

Defendant Gravitas, LLC, sold a country club and golf course to Heritage Golf Group in 2023. Stephen Quisenberry claims that he identified Heritage as the purchaser for Gravitas's property, but that Gravitas and Heritage excluded him from the negotiations and sale. Quisenberry sues Gravitas for unjust enrichment, seeking to recover the fair value of the benefit he allegedly conferred on Gravitas by procuring a buyer. *See* Am. Compl. (Doc. 28). Gravitas moves for summary judgment, MSJ (Doc. 36), and Quisenberry opposes, Resp. (Doc. 39). Because genuine disputes of material fact remain surrounding whether Quisenberry procured Heritage as the purchaser, and because neither of Gravitas's affirmative defenses succeed, I deny Gravitas's motion.

## I.    BACKGROUND

In the fall of 2022, Gravitas owned and operated the Club at Grandezza, a private country club and golf course located in Estero, Florida, that

"marketed itself as one of the premier gated communities in the Naples/Estero market." Joint Statement of Undisputed Facts (JSUF) (Doc. 38) ¶¶ 1, 28–30. That year, Gravitas's owners began discussing selling Grandezza. Whitmer Dep. (Doc. 37-23) 23:2–10. In September 2022, Gravitas's Vice President Randy Whitmer spoke with Blake Patterson, a wealth manager at AllianceBernstein, to see whether he "knew of anyone that might be interested" in purchasing a private golf club in Southwest Florida. *Id.* 25:5–26:7; Patterson Dep. (Doc. 39-17) 22:10–18, 104:21–24. Patterson signed a confidentiality agreement authorizing him to share certain information with prospective buyers. Patterson Dep. 28:20–29:16; (Docs. 39-2, 39-3). Gravitas then sent Patterson redacted versions of Grandezza's 2020 and 2021 balance sheets, statements of operations and member's deficits, cash flow statements, as well as a document entitled "Summary of Information for AB Project – Financials." (Doc. 39-5).

In October 2022, Patterson contacted Stephen Quisenberry, an investment banker with whom he previously dealt, to discuss the potential sale of the golf course and "[t]o see if [Quisenberry] had any relationships in the golf world." Patterson Dep. 30:1–11. After Patterson and Quisenberry spoke on the phone, Patterson emailed Quisenberry "preliminary [financial] information on the golf course in Florida" and thanked him for his "willingness to help circulate this opportunity." (Doc. 39-4). Patterson did not disclose the golf course's identity to Quisenberry. Quisenberry Dep. (Doc. 37-1) 49:17–20.

The next month, Quisenberry contacted Heritage Golf Group, a "company that is known in the golf club community as a purchaser of golf courses," JSUF ¶ 6, and was known to Quisenberry through his twenty-five-year professional relationship with Heritage's investment firm owner, KSL Capital Partners, Quisenberry Dep. 36:4–13. Quisenberry spoke with Heritage's Vice President, Jody Graham, about a golf course for sale in Florida, although he did not disclose the property's name. *See* Graham Dep. (Doc. 37-24) 34:2–37:6. On November 20, 2022, Graham emailed Quisenberry a link to a press release about Heritage's recent acquisition of golf clubs in Denver and wrote, "Look forward to learning more about the Naples opt." (Doc. 37-4) at 4. That same day, Quisenberry forwarded Graham's email to Patterson, noting that "[t]hese guys are very interested in the golf club." *Id.* at 3. Patterson forwarded the message to Whitmer. *Id.* Although Whitmer responded, "[r]egarding [Quisenberry], it is a no for now," Patterson told Quisenberry that Whitmer would meet with him before the end of the year. *Id.* at 2–3.

Quisenberry emailed Graham that he was scheduled to meet with the golf course's owner "to discuss engaging me to represent them in the sale of the course" and explained that he "suggested to them [Heritage's] interest and the possibility of a preemptive offer." (Doc. 37-12) at 2. After Graham signed a non-disclosure agreement, (Doc. 37-7), Quisenberry sent Graham a redacted copy of Grandezza's financials and asked Graham for "a rough idea of valuation that

3

I can share with the potential client than I can facilitate an accelerated process here and not waste anyone's time." (Doc. 37-12) at 1. Graham asked Quisenberry additional questions about the club and whether Quisenberry could obtain 2022 financials. *See* (Doc. 37-19) at 6. Quisenberry told Graham that he would follow up and that his "guess is mid $20's would transact." (Doc. 37-19) at 5.

Quisenberry then requested Grandezza's 2022 financials from Patterson, indicating that those financials and "2023 projections" "could drive a better #" for the property. (Doc. 39-6). On December 6, 2022, Patterson responded that he was "working on it," to which Quisenberry replied, "[h]opefully [Gravitas] will want to hire me to do the deal," explaining again that Heritage was interested and willing to move quickly. *Id.* Patterson replied, "Yes, my hope is that they will want to hire you and that we can move very fast to close. When I speak with them, I will express some of this, so they understand the type of buyer you are bringing to the table." *Id.* Two days later, Patterson sent Quisenberry updated 2022 financials and membership information, telling him that he "should be good to share them with Heritage." (Doc. 37-27) at 2. Quisenberry shared that information with Graham, still without disclosing the name of the golf course. (Docs. 39-7, 39-8).

Patterson then arranged an introductory phone call to introduce Quisenberry to Whitmer "as an investment banker who has expertise in this

sector of the industry." Quisenberry Dep. 47:23–48:2; *see* Whitmer Dep. 28:5–22. At some point in late 2022, Quisenberry and Whitmer had at least one but "no more than two telephone conversations about [Gravitas] potentially retaining [Quisenberry]" to broker the sale. JSUF ¶ 15. During the first of those calls, Quisenberry explained to Whitmer and Patterson that he "could run a process to get out to as many buyers as [Gravitas] would like it to go to," and suggested a "shorter and quicker" preemptive process for which Quisenberry would charge three to six percent of the final transaction value. Quisenberry Dep. 96:9–24. But Quisenberry did not provide Gravitas "with any written documentation about what 'standard' or 'industry standard' rate he believed would apply" and the parties "never had any agreed terms related to compensation for the [t]ransaction." JSUF ¶¶ 22–23. Ultimately, "[a]fter one phone call, [Gravitas] decided to hold off on retaining [Quisenberry]" and did not hire him to represent it in its sale of Grandezza. *Id.* ¶¶ 15–20.

On January 9, 2023, Quisenberry texted Patterson that Graham asked whether the golf club for sale was "grandezza by any chance?" because Graham "know[s] the owners assuming same group" from his previous work at Grandezza. (Doc. 37-13) at 2. The next day, Patterson responded, "Lol bingo" and proposed confirming Graham's question "in confidentiality." *Id.* at 7. The same evening that Graham texted Quisenberry, Graham also texted Whitmer—whom he had known since at least 2020—that "someone reached

out to me saying that he heard Grandezza is for sale? If so we would be very interested, all cash buyers and can close quickly or at whatever pace you see fit." (Doc. 37-26) at 1; *see* JSUF ¶¶ 8–9. Graham and Whitmer then spoke on January 10 and 16, and Gravitas sent Graham a non-disclosure agreement on January 17. *See* (Doc. 37-26) at 2–4; (Doc. 39-9). According to Graham, his interactions with Quisenberry "never came up" in talking with Whitmer. Graham Dep. 53:13–21. In contrast, although Whitmer claims that he did not discuss Quisenberry during his first conversation with Graham, Whitmer "was aware that Mr. Quisenberry had contact with [Graham]" and testified that "[i]n a future conversation" he asked Graham if Quisenberry represented Heritage, to which Graham said, "[n]o." Whitmer Dep. 49:4–24. Whitmer never told Quisenberry that he knew anyone at Heritage. JSUF ¶ 10.

In February 2023, Gravitas provided Heritage with Grandezza's financial and membership information, (Doc. 39-10); in May, Heritage signed a letter of intent to purchase Grandezza, (Doc. 39-12); and in June, Heritage and Gravitas entered into a purchase and sale agreement for the golf club, (Doc. 39-13); Whitmer Dep. 60:1–12; JSUF ¶ 1. The sale "covered all aspects of the private country club, including the real property." JSUF ¶ 2; Gravitas Am. Ans. (Doc. 31) ¶ 17; *see* (Doc. 39-13). The sale closed on September 12, 2023, for $27,300,000. *See* (Doc. 39-15); (Doc. 39-13) at 5.

Three months later, Quisenberry learned about the sale in an online press release, which he then forwarded to Graham along with their previous emails detailing "evidence of [Quisenberry's] involvement and price guidance [Graham] had requested." (Doc. 39-16); (Doc. 37-19) at 4–5. Graham responded that he did "not doubt[] [Quisenberry's] involvement," but "had no idea that [Whitmer] knew you were involved with Heritage." (Doc. 37-19) at 4. Quisenberry then threatened to sue Heritage for breach of contract and tortious interference, and the parties settled the claim for $40,000 in April 2024. *See* (Doc. 37-19) at 1–3; Quisenberry Dep. 99:21–25; (Doc. 37-20).

In November 2024, Quisenberry sued Gravitas for unjust enrichment, seeking "the fair value of the services that he provided to [Gravitas]," or $1,365,000, "equal to 5 percent of the $27,300,000" sale price for Grandezza. Am. Compl. ¶¶ 17, 25; *see generally* Compl. (Doc. 1). At the time of suit, Quisenberry was in Chapter 13 bankruptcy proceedings, but did not amend his petition to include his claim against Gravitas. *See* JSUF ¶¶ 31–35. Gravitas moves for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A material fact is in "genuine" dispute if a reasonable jury could return a verdict in favor of the nonmoving party. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016).

The movant bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate a lack of genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, and so on) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court reviews the record evidence as identified by the parties and draws all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262 (11th Cir. 2020). Here, to the extent that the record is disputed or capable of multiple inferences, the Court draws them for the nonmovant.

## III.   ANALYSIS

Gravitas makes three primary arguments in favor of summary judgment. First, Gravitas insists that Quisenberry cannot establish the

elements of an unjust enrichment claim because he did not procure a buyer for Grandezza. *See* MSJ at 10–14. Second, Gravitas says that Quisenberry cannot recover in equity because he was not a licensed real estate broker under Florida law. *Id.* at 14–16. Third, Gravitas avers that Quisenberry is judicially estopped from bringing the claim because he failed to list it in his Chapter 13 bankruptcy proceeding. *Id.* at 16–19. Gravitas's three arguments fail.

## A. Genuine disputes of material fact preclude summary judgment in favor of Gravitas

To prevail on a claim of unjust enrichment under Florida law, a plaintiff must prove that he (1) conferred a benefit on the defendant, (2) the defendant knew of the benefit and (3) voluntarily retained the benefit, and (4) it would be inequitable for the defendant to retain the benefit without paying its value to the plaintiff.[1] *See Taxinet Corp. v. Leon*, 114 F.4th 1212, 1219 (11th Cir. 2024) (citing *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022)). As an equitable remedy, unjust enrichment is permissible only where no adequate legal remedy exists. *See American Honda Motor Co., Inc. v. Motorcycle Info.*

---

[1] Gravitas only halfheartedly argues the latter three elements. It is undisputed that Gravitas knew of the benefit because Quisenberry "proposed Heritage as a potential purchaser of the country club," JSUF ¶ 10, and Gravitas retained the benefit by ultimately selling the club to Heritage, JSUF ¶¶ 1–2, 6. As for equity, Gravitas suggests that Heritage's settlement payment to Quisenberry fairly compensated him for his role. MSJ at 13–14. But that settlement pertained to Quisenberry's separate contractual claims against Heritage. *See* Resp. at 18. In contrast, the parties here agree that there was no express contract between them, JSUF ¶¶ 17–26, and by logical extension, no legal remedy available to Quisenberry.

*Network, Inc.*, 390 F. Supp. 2d 1170, 1178 & n.34 (M.D. Fla. 2005) (citing, in part, *Bowleg v. Bowe*, 502 So.2d 71, 72 (Fla. 3d DCA 1987) (per curiam)).

In transactions for the sale of real property or businesses, "Florida law recognizes that a broker may recover compensation under the theory of unjust enrichment." *Media Servs. Grp., Inc. v. Bay Cities Commc'ns, Inc.*, 237 F.3d 1326, 1329 (11th Cir. 2001). To do so, a broker "must show either the existence of an implied contract to pay him for services in finding and negotiating with the ultimate purchasers, or that he was the procuring factor in the sale." *Id.* (citation modified). To be the procuring cause of the sale, "the broker must have brought the [parties] together and effected the sale as a result of continuous negotiations inaugurated by him unless the seller and buyer intentionally exclude the broker and thereby vitiate the need for continuous negotiations."[2] *Id.* (quoting *Sheldon Greene & Assocs., Inc. v. Rosinda Invs., N.V.*, 475 So.2d 925, 927 (Fla. 3d DCA 1985)). In other words, "the broker must initiate negotiations by doing some affirmative act to bring buyer and seller together." *Rotemi Realty, Inc. v. Act Realty Co.*, 911 So. 2d 1181, 1189 (Fla. 2005) (citation modified). In most cases, "simply being the 'spark' initiating Buyer's interest,

---

[2] "[I]ntentional exclusion does not require a showing of bad faith," only "that the buyer has negotiated directly with the seller without the participation of the broker who first brought the parties together," often in secret. *Media Servs. Grp.*, 237 F.3d at 1330. "[B]oth parties must know of the broker's involvement and intend to exclude him." *Lee Giusti Realty, Inc. v. L.D. Corp.*, 603 So. 2d 39, 40 (Fla. 4th DCA 1992) (per curiam).

with little more affirmative action, is sufficient to be the procuring cause where . . . the parties intentionally excluded the broker thereafter." *DM Yachts v. Denison Yacht Sales, Inc.*, No. 18-62499-CIV, 2020 WL 3963696, at \*6 (S.D. Fla. July 13, 2020) (citing *Alcott v. Wagner & Becker, Inc.*, 328 So. 2d 549, 550 (Fla. 4th DCA 1976)).

Whether someone is the "procuring cause" of a transaction between two parties presents a question of fact for the jury. *BKR Glob., LLC v. FourWinds Cap. Mgmt.*, 661 F.3d 1134, 1137 (11th Cir. 2011) (citing *Easton–Babcock & Assoc., Inc. v. Fernandez*, 706 So.2d 916, 919 (Fla. 3d DCA 1998)); *Osheroff v. Rauch Weaver Millsaps & Co.*, 882 So. 2d 503, 505 (Fla. 4th DCA 2004); *see also Allenby & Assocs., Inc. v. Crown St. Vincent Ltd.*, 8 So. 3d 1211, 1213 (Fla. 4th DCA 2009) (denying summary judgment where "genuine issues of material fact remain as to whether [the plaintiff] was the procuring cause of the sale" of the defendant's yacht). Still, "summary judgment may be entered where the record plainly demonstrates that the broker was not the procuring cause of the sale." *Real Cap. Partners, LLC v. Alhambra Ctr. Int'l, Ltd.*, 390 So. 3d 241, 244 n.5 (Fla. 3d DCA 2024); *see Edwards v. Brandon Realty, Inc.*, 497 So. 2d 269, 272 (Fla. 2d DCA 1986) (reversing entry of summary judgment for brokers and directing trial court to enter summary judgment for buyers and sellers); *cf. DM Yachts*, 2020 WL 3963696, at \*4 (finding sufficient factual disputes to deny summary judgment where yacht broker "sen[t] one text message with brief

11

information about the (unnamed) Invader [yacht] and one email attaching the Invader's broker-friendly brochure to Buyer," despite the buyer contending he learned of the yacht elsewhere).

Gravitas does not resist the inherently factual nature of the "procuring cause" inquiry, nor does it seriously argue that Quisenberry failed to take an "affirmative action." *See generally* MSJ. Instead, Gravitas argues that Quisenberry could not have procured Heritage as a buyer because Gravitas "could not be introduced to a company they already knew and to that company's agent, which [Gravitas] had a prior professional and personal relationship with." MSJ at 12. According to Gravitas, then, Quisenberry's actions at most "were collateral to, and immaterial[] to, the ultimate sale . . . of [Gravitas's] golf course to Heritage," a party whose agent reached out to Gravitas "independently." *Id.* at 13. Gravitas's argument proves too much and finds limited support in the Florida caselaw, which recognizes a low threshold for a "procuring cause" conclusion. *See, e.g.*, *Alcott*, 328 So. 2d at 550–51 (concluding that broker established prima facie case although he did nothing beyond bringing the property to the buyer's attention with an advertisement); *Nat'l Airlines, Inc. v. Oscar E. Dooly Assocs., Inc.*, 160 So. 2d 53, 54–55 (Fla. 3d DCA 1964) (per curiam) (finding that broker was procuring cause of transaction where he called buyer's attention to property, obtained a price quote from

12

seller, and corresponded with both parties, even though he did not physically introduce them).

To be sure, it is undisputed that Whitmer and Graham knew one another before October 2022, and even before 2020, from Graham's third-party management role at Grandezza. JSUF ¶¶ 8–9; Whitmer Dep. 15:11–17:20. What Quisenberry disputes, though, is whether his communications with Graham *prompted* Graham to contact Whitmer about the potential sale of Grandezza. *See* Resp. at 11–14. Most of the evidence on this question is circumstantial, as Graham repeatedly declined to disclose how he learned that Grandezza's owners were interested in selling. *See, e.g.*, Graham Dep. 44:10–20. "Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the non-movant's claim rests." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). I cannot make that conclusion here, where other evidence suggests that neither seller nor buyer were clued into the others' interest before Quisenberry's involvement.

First, although Whitmer knew Graham, he was unsure whether he had spoken to Graham since 2020. *See* Whitmer Dep. 18:23–19:1; *see also* (Doc. 37-25). More, Whitmer "could not recall" whether he was familiar with Heritage, did not know of Graham's business development role, and did not know anyone else at Heritage. *See* Whitmer Dep. 31:9–16, 77:5–78:10; *see also* Graham Dep.

13

121:1–8 (explaining that Heritage was "pretty new in [its] infancy" at that point and Whitmer "might've forgotten" that Graham worked there). Unsurprisingly, then, "[w]hen [Quisenberry] proposed Heritage as a potential purchaser of the country club, [Gravitas, acting through Whitmer] never told [Quisenberry] that it had any relationship with Heritage." JSUF ¶ 10. From that evidence, a reasonable jury could conclude that neither Whitmer nor Gravitas were aware of Heritage as a potential purchaser before Quisenberry's email introducing them as "very interested in the golf club."[3] (Doc. 37-4) at 3.

Second, there remains reasonable disagreement about how Graham learned that Grandezza was for sale. Resp. at 15–17. Although Graham claims to have acquired this information from someone other than Quisenberry, Graham repeatedly declined to reveal his source:

> Q: How did you learn that a group was looking into Grandezza?
> A: I guess someone within the industry, a friend of mine caught wind of it.
> Q: And who was that friend?
> A: I don't think I need to share.
> Q: Who was that friend? That is important how you learned. So who was that friend that told you?
> A: It was someone within the industry.
> Q: Who?

---

[3] Additionally, at the time of Whitmer's conversation with Quisenberry, evidence suggests that Gravitas already had unsuccessful conversations with two potential buyers, neither of whom were Heritage. *See* (Doc. 37-4) at 3; Whitmer Dep. 29:7–16; Patterson Dep. 38:8–16, 112:7–10.

A: I don't think I need to share.

Graham Dep. 44:10–20.

Notwithstanding Graham's evasiveness, which raises credibility questions for a jury, other evidence permits an inference that Graham relied on Quisenberry's communications in contacting Whitmer. For example, Graham texted Quisenberry and Whitmer on the same evening in January 2023 inquiring about Grandezza. *Compare* (Doc. 37-13) at 2 (asking whether the club Quisenberry presented was Grandezza), *with* (Doc. 37-26) at 1. At that same time, Patterson represented to Quisenberry that the name of the club "can't get out to the public/the Naples community," suggesting that no one else knew of the opportunity. (Doc. 37-13) at 7. Ultimately, even if Graham heard a rumor that Grandezza was on the market elsewhere, *see* Graham Dep. 45:6–19, it could still be true that Graham did not contact Whitmer *until* he determined that the financials he received from Quisenberry were Grandezza's. In that case, Quisenberry could still be considered "the genesis for all subsequent dealings including the ultimate sale of the property," albeit through a relatively minor "affirmative act." *S. Pac. Enters., Ltd. P'ship v. Cornerstone Realty, Inc.*, 672 So. 2d 568, 570 (Fla. 4th DCA 1996).

Other inconsistencies would allow a reasonable jury to doubt Graham's testimony and to conclude that Graham understated Quisenberry's initial role and that the parties excluded Quisenberry from later negotiations. For

15

example, Graham recounted that his unnamed source told him that "there was a group that toured the property," Graham Dep. 47:1–4, yet Whitmer did not recall any prospective buyers touring Grandezza, Whitmer Dep. 53:14–17. More, Graham denies ever speaking with Whitmer about Quisenberry, Graham Dep. 69:18–25, while Whitmer says that he directly questioned Graham about Quisenberry's representation, Whitmer Dep. 49:15–20. In either event, Graham knew that had Gravitas been listed with a broker, Heritage would have expected a brokerage fee to attach to the transaction, thus influencing the price. *See* Graham Dep. 86:18–87:15. A reasonable jury could conclude that Whitmer assumed the same, because despite conversations between Gravitas and Heritage throughout 2023, Whitmer represented to Quisenberry that the sale of Grandezza was paused, Quisenberry Dep. 56:2–9, 93:1–13; *see* (Doc. 37-13), and later declined to respond altogether, (Doc. 39-11). Whitmer's conduct permits an inference that he intentionally excluded Quisenberry from negotiations.

At this stage, sufficient factual dispute remains regarding whether Quisenberry was the "procuring cause" of Heritage's purchase of Grandezza, thereby precluding an award of summary judgment in Gravitas's favor.

16

### B. Quisenberry's noncompliance with Florida's brokerage licensure requirement does not bar his claim

Next, Gravitas argues that even if Quisenberry procured Heritage as the purchaser for Grandezza, "any remuneration allegedly owed to [him] is prohibited by Section 475.41, Florida Statutes" because Quisenberry is not a licensed broker in Florida.[4] MSJ at 14. Quisenberry disagrees, contending that the statute's public policy against commissions for unlicensed brokers is not implicated in the "sophisticated business enterprise sale" at issue here. Resp. at 20. Quisenberry has the better of the two positions.

Under Florida law, "[a] person may not operate as a broker . . . without being the holder of a valid and current active license." § 475.42(1)(a), Fla. Stat. A "broker" is "a person who, for another, and for a compensation or valuable consideration . . . attempts or agrees to . . . negotiate the sale, exchange, purchase . . . of business enterprises or business opportunities" or who "takes any part in the procuring of sellers, purchasers, lessors, or lessees of business enterprises or business opportunities." § 475.01(1)(a), Fla. Stat. Where a broker "operates" without a valid license, a "contract for a commission or

---

[4] Without further argument or elaboration, Gravitas also says that Quisenberry's claim is barred by Section 517.12, Florida Statutes and Section 15(a) of the Securities and Exchange Act. *See* MSJ at 3. Those arguments are abandoned. *See NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

17

compensation for" his brokerage services is invalid. § 475.41, Fla. Stat. As conventionally understood, the statute aims to "protect the public in general from untrained and unsupervised real estate operators." *Hayden v. Urvan*, No. 24-13146, 2025 WL 2103405, at *3 (11th Cir. July 28, 2025).

Here, the parties agree that Quisenberry is not a Florida "licensed real estate broker" or "real estate agent." JSUF ¶¶ 13–14. According to Gravitas, then, even if it agreed for Quisenberry to broker the sale of Grandezza, any such contract would have been invalid from inception. *See* MSJ at 15–16. And because Quisenberry would be unable to recover in contract, Gravitas says he cannot recover in equity. *Id.* at 15 (citing *Palma v. S. Fla. Pulmonary & Critical Care, LLC*, 307 So. 3d 860, 869 (Fla. 3rd DCA 2020) (precluding a party "in the name of equity, [from] do[ing] an end run around what the law forbids")). As a general proposition, Gravitas is correct that, "[g]enerally, a party has no claim in [unjust enrichment] for performance rendered under a promise that is unenforceable on grounds of public policy." *Fabricant v. Sears Roebuck*, 202 F.R.D. 306, 309 (S.D. Fla. 2001) (citing RESTATEMENT (SECOND) OF CONTRACTS § 197). Quisenberry responds that the statutory licensure requirement—and its underlying public purpose—does not apply here, and even if it did, whether he performed "brokerage" services rather than "business-development services facilitating a business-enterprise transaction between sophisticated parties . . . presents disputed factual issues." Resp. at 20–21.

At first, Quisenberry does not persuade that the *kind* of transaction here falls outside the statutory ambit simply because it included "all aspects of the private country club," including non-real property. *See* JSUF ¶ 2. Instead, based on the plain language of § 475.01, "[t]here is nothing ambiguous about the statute's inclusion of non-real estate transactions under its purview." *Meteor Motors, Inc. v. Thompson Halbach & Assocs.*, 914 So. 2d 479, 482 (Fla. 4th DCA 2005) (concluding that the statute "regulates business brokers without any connection to real estate" and thus applied to the brokerage of an automobile dealership). Even so, Florida (and federal) courts recognize that "not all transactions involving an unlicensed party must be voided." *Hayden*, 2025 WL 2103405, at *3 (citing *Tassy v. Hall*, 429 So. 2d 30, 34 (Fla. 5th DCA 1983)). For example, "Florida courts have declined to strictly construe the statute and invalidate contracts where 'the defendants would gain an unconscionable advantage by avoiding a just obligation which they had contracted to pay' and '[n]o protection of the public would be accomplished.'" *Id.* (quoting *Morgan v. Glassman*, 285 So. 2d 673, 675 (Fla. 3d DCA 1973)); *Mod. Realty of Mo., Inc. v. Shivers & Assocs., Inc.*, 705 F. Supp. 556, 560 (S.D. Fla. 1989) (collecting cases declining to void commissions where defendants were not "members of the class which the licensing statute was designed to protect"); *see Ledecky v. Source Interlink Cos.*, 2007 WL 396997, at *6 (D.D.C.

Feb. 1, 2007) (finding that application of § 475.41 to void commission contract would frustrate the parties' intent without further protecting the public).

One step further, if the parties' hypothetical contract would not be void for public policy, an equitable claim existing "at the margins" of that agreement can succeed without making an "end run" around the law. *See* RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 2(2) cmt. C. For example, in *Hayden v. Urvan*, the Eleventh Circuit affirmed the district court's decision upholding a jury's refusal to invalidate an unlicensed business broker's fee where the defendant was "a sophisticated businessman with knowledge of the industry and a long-term professional relationship with [the plaintiff]." 2025 WL 2103405, at *3. Accordingly, "[e]ven if [the plaintiff] acted as a 'broker' the statute still would not bar him from unjust enrichment compensation" "because this is not a case where the public is 'being forced to deal with [a] dishonest or unscrupulous' broker." *Id.* (quoting *Pokress v. Tisch Fla. Props., Inc.*, 153 So. 2d 346, 350 (Fla. 3d DCA 1963)); *see id.* (describing the defense as "highly formalistic and unfair" on the facts); *see also TOA Trading LLC v. Mullen Auto., Inc.*, No. 22-21089-CV, 2024 WL 2132885, at *4 (S.D. Fla. Apr. 24, 2024) (same).

Here, Gravitas was not a member of the public *forced* to deal with unscrupulous brokers and cannot invoke § 475.41 to bar Quisenberry's claim. On this point, Gravitas does not seriously dispute that its agent Whitmer was

"a sophisticated businessman with knowledge of the industry." *Hayden*, 2025 WL 2103405, at *3. In fact, Gravitas regularly invested in businesses and previously purchased both a concrete company and another golf course. *See* Whitmer Dep. 10:9–12:6. And in this case, Quisenberry did not approach Gravitas to lure its business. Instead, Whitmer explained to Patterson that Gravitas "had this asset" and was "looking for a certain type of buyer, and looking to see if [Patterson] knew of anyone that might be interested." Whitmer Dep. 25:5–10; Gravitas Resp. to Interrogs. (Doc. 37-35) ¶ 3 (explaining that Gravitas was looking for a buyer).

In turn, Patterson—at minimum purporting to act on behalf of Gravitas—propositioned Quisenberry, with whom he arguably had a "long-term professional relationship," *Hayden*, 2025 WL 2103405, at *3, "to help circulate [the] opportunity." (Doc. 39-4); *see* (Doc. 37-27) at 2 (email from Patterson informing Quisenberry that he "should be good to share [financials] with Heritage"). At no point did Whitmer or Patterson inquire into whether Quisenberry was a Florida licensed broker. *See* Patterson Dep. 75:9–76:13. Even with no assurance that Quisenberry was licensed, and although "[n]o broker was *necessary* for Heritage to contact [Gravitas]," JSUF ¶ 12 (emphasis added), Whitmer still "assume[d]" that Quisenberry would expect compensation for identifying a buyer. Whitmer Dep. 85:9–20. Because a concern for protecting the public does not appear on this record, "[e]ven if

21

[Quisenberry] acted as a 'broker' the statute still would not bar him from unjust enrichment compensation." *Hayden*, 2025 WL 2103405, at *3.

Finally, although Gravitas abandons its argument that securities laws bar Quisenberry's claim, a cursory review of the relevant framework supports the above treatment of Florida's brokerage licensing regime. Both § 517.12, Florida Statutes, and 15 U.S.C. § 78o require that brokers maintain active state or federal registrations to deal in securities. Assuming either statute applies to the transaction here—which Gravitas suggests by (perfunctorily) raising the issue—each recognizes that being a business "finder" is a "limited exception 'that permits a person or entity to perform a narrow scope of activities without triggering the broker/dealer registration requirements,' under Florida law." *Quantum Cap., LLC v. Banco de los Trabajadores*, No. 14-cv-23193, 2016 WL 10536988, at *8 n.7 (S.D. Fla. Sept. 8, 2016) (quoting *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011)); *see Kramer*, 778 F. Supp. 2d at 1336 (collecting cases that recognize a "finder's exception" to federal broker registration requirements). Unlike brokers who "bring the parties to an agreement on particular terms," finders merely "find potential buyers or sellers" and "stimulate interest and bring the parties together." *Stevens v. Penn Nat'l Gaming Inc.*, No. 11-20214-CIV, 2011 WL 13223519, at *4 (S.D. Fla. Oct. 17, 2011). Given Quisenberry's exclusion from later negotiations, his role here comes closer to that of "finder" than "broker."

22

Returning to *Hayden*, the district court refused to apply the business broker defense, recognizing that "inequities" would result. There, the court determined that "[i]t would be unreasonable to preclude recovery based on Chapter 475—which initially began to protect the public from unscrupulous real estate operators—when the Florida Securities and Investor Protection Act and the Securities Exchange Act (which are more pertinent to the instant transaction) permit a finder's exception." *Hayden v. Urvan*, No. 21-CV-82051, 2024 WL 3981764, at *14 (S.D. Fla. Aug. 27, 2024), *aff'd* 2025 WL 2103405, at *4 (concluding that the district court correctly dismissed each defense based on the plaintiff's limited involvement in negotiations). Although the parties do not address whether either securities statute is "more pertinent" to the transaction at hand, or whether either preempts or displaces Florida's real estate licensing statute, the "finder's exception" appears to apply. That result cautions against applying § 475.41 to bar Quisenberry's claim where Gravitas's agent was a "sophisticated businessman who," through Patterson, "was dealing with a fellow businessman who were friendly and well known to one another." *Hayden*, 2024 WL 3981764, at *14.

### C. Under Florida law, Quisenberry is not judicially estopped from asserting an unjust enrichment claim

In its final push for summary judgment, Gravitas argues that Quisenberry is estopped from asserting an unjust enrichment claim because

23

he failed to disclose the claim in his Chapter 13 bankruptcy proceeding. *See* MSJ at 16–19. Quisenberry does not dispute that he failed to disclose (or amend his petition to disclose) the claim at issue, *see* JSUF ¶¶ 32–34, but argues instead that the equitable doctrine does not foreclose his claim where he did not "intentionally hid[e] his claim against Gravitas" and where "[n]o debts were discharged in the bankruptcy proceeding." Resp. at 23. While the parties' debate touches the central bases of judicial estoppel under federal law, that proves to be the wrong framework here.

Under the federal standard in the Eleventh Circuit, "a district court may apply judicial estoppel when a two-part test is satisfied: the plaintiff (1) took a position under oath in the bankruptcy proceeding that was inconsistent with the plaintiff's pursuit of the civil lawsuit and (2) intended to make a mockery of the judicial system." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (en banc). Perhaps Gravitas wins under that test. But the present action is based solely on this Court's diversity jurisdiction, *see* Am. Compl. ¶¶ 1–2, and "[i]n diversity cases, 'the application of the doctrine of judicial estoppel is governed by state law.'" *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1358 n.7 (11th Cir. 2018) (quoting *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 930 (11th Cir. 1995) (per curiam)).

In Florida, a party must establish four elements to invoke judicial estoppel: "[1] A claim or position successfully maintained in a former action or judicial proceeding [2] bars a party from making a completely inconsistent claim or taking a clearly conflicting position in a subsequent action or judicial proceeding, [3] to the prejudice of the adverse party, [4] where the parties are the same in both actions, subject to the 'special fairness and policy considerations' exception to the mutuality of parties requirement." *Salazar-Abreu v. Walt Disney Parks and Resorts U.S., Inc.*, 277 So. 3d 629, 631 (Fla. 5th DCA 2018) (quoting *Grau v. Provident Life & Acc. Ins.*, 899 So. 2d 396, 400 (Fla. 4th DCA 2005)). Unlike Florida's rule, the federal parallel "does not consider whether the inconsistent claim succeeded in the prior action, whether there was prejudice to the opposing party, or whether there was mutuality of the parties subject to the special fairness and policy considerations exception." *Id.* at 633 (citation modified).

Applying Florida law, the latter two factors prove dispositive. First, prejudice "occurs when the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Grau*, 899 So. 2d at 400 n.3 (citation modified). Because Gravitas was not one of Quisenberry's creditors, Gravitas does not explain how it is prejudiced by the inconsistent positions. *See id.* at 401–402. Second, and relatedly, Gravitas was not a party to the bankruptcy proceedings

25

and therefore cannot invoke the doctrine. *See Boneta v. Am. Med. Sys., Inc.*, 524 F. Supp. 3d 1304, 1318–19 (S.D. Fla. 2021) ("Florida courts have consistently rejected the application of judicial estoppel to bar claims undisclosed in bankruptcy where the defendant seeking to invoke the doctrine was not involved in any way in the bankruptcy proceedings." (collecting cases)). Finally, "special fairness and policy considerations" do not require excusing the mutuality requirement. Such considerations "come into play only if" Quisenberry used "intentional self-contradiction to obtain an unfair advantage in litigation." *Osorio v. Dole Food Co.*, No. 07-22693-CIV, 2009 WL 48189, at *16 (S.D. Fla. Jan. 5, 2009) (quoting *Grau*, 899 So. 2d at 401)). On this score, there is insufficient evidence to conclude that Quisenberry intentionally contradicted himself.

Here, in October 2023, Quisenberry filed a Chapter 13 bankruptcy petition to prevent his home from being foreclosed. *See* Resp. at 22; Quisenberry Decl. (Doc. 39-18) ¶ 2. Expectedly, that petition did not list claims against Gravitas because Quisenberry had not learned that Heritage purchased Grandezza. *See* (Doc. 37-36); Quisenberry Dep. 145:17–146:2. Once Quisenberry discovered that fact, he had an obligation to amend his petition, but did not do so. *See Ajaka v. BrooksAmerica Mortg. Corp.*, 453 F.3d 1339, 1344 (11th Cir. 2006) (explaining that the duty to disclose under 11 U.S.C. §§ 521(1) and 541(a)(7) "is a continuing one that does not end once the forms

26

are submitted to the bankruptcy court; rather, a debtor must amend his financial statements if circumstances change"); JSUF ¶¶ 32–33. That said, according to Quisenberry, he contacted his bankruptcy attorney in January 2024 "about the potential claim related to the sale of Grandezza, so [his] bankruptcy attorney was aware . . . that the claim existed." Quisenberry Decl. ¶¶ 2, 4. After Quisenberry sued Gravitas, he "forwarded [his] bankruptcy attorney's office an email exchange between [his] attorney in this action and Gravitas' attorney about the filing of the complaint along with a copy of the complaint" and relied on his bankruptcy attorney to amend. Quisenberry Decl. ¶¶ 6–8. So, he says he "never intended to conceal [his] claim in this action from the bankruptcy proceeding." *Id.* ¶¶ 7–8.

Ultimately, despite Quisenberry's duty to amend, his explanation—which Gravitas does not rebut—permits a reasonable inference that his nondisclosure was unintentional and that any "duty would not have been known to [him], especially given that [he was] represented by different counsel in bankruptcy and in the instant suit." *Boneta*, 524 F. Supp. 3d at 1320; *see Montes v. Mastec N. Am., Inc.*, 132 So. 3d 1195, 1197 (Fla. 3d DCA 2014) (excusing failure to list claim in bankruptcy proceedings as unintentional). Accordingly, Gravitas fails to persuade that judicial estoppel applies here.

27

## IV.    CONCLUSION

Gravitas fails to establish that there is no genuine dispute of material fact regarding whether Quisenberry procured Heritage as the ultimate purchaser of Grandezza, and in turn, whether Gravitas excluded Quisenberry from later conversations about the golf course's sale. Likewise, Gravitas does not persuade that Quisenberry's claim is barred either by Florida statute or the doctrine of judicial estoppel.

The following is therefore **ORDERED:**

1.    Defendant Gravitas, LLC's Motion for Summary Judgment (Doc. 36) is **DENIED**.

**ORDERED** in Tampa, Florida, on January 30, 2026.

Kathryn Kimball Mizelle
United States District Judge

28